# STATE v. BLANK

No. 2408. Decided July 9, 1913 (134 Pac. 735).

1. CRIMINAL LAW—WAIVER OF ERROR IN APPELLATE COURT. Assignments of error, which are not discussed by the appellant, are deemed waived and will not be considered. (Page 212.)

2. ANIMALS—MARKS AND BRANDS—CRIMINAL PROSECUTIONS—EVIDENCE. In a prosecution for altering and defacing a wool brand on sheep with intent to steal them and prevent their identification by the owner, evidence *held* insufficient to show that accused and his partner were not the owners of the sheep. (Page 212.)

3. ANIMALS—MARKS AND BRANDS—CRIMINAL PROSECUTIONS—EVIDENCE. On a trial for altering and defacing a wool brand on sheep, where the evidence showed affirmatively that one of the defendants took no part whatever in the branding, evidence that he purchased the paint for the other defendant was not sufficient to justify the court in submitting the question of his guilt to the jury. (Page 216.)

APPEAL from District Court, Seventh District: *Hon. A. H. Christensen,* Judge.

Martin Blank was convicted of an offense. He appeals.

REVERSED WITH DIRECTIONS.

*S. A. King* for appellant.

*A. R. Barnes,* Attorney General, and *E. V. Higgins* and *Geo. C. Buckle,* Assistant Attorneys General, for the State.

McCARTY, C. J.

Martin Blank and one Henry Calvert were informed against in the district court of Emery county, Utah, and charged with having, on the 27th day of November, 1911, altered and defaced the wool brand on eighteen head of sheep, alleged to be the property of one I. A. Richards, "with intent then and there and thereby to feloniously steal, take, and drive away said sheep and to prevent the identifi-

cation of the said sheep by the said I. A. Richards," etc. Pleas of not guilty were entered by the parties, and they were tried together. Calvert was acquitted, and defendant Blank was convicted. Thereupon Blank moved the court for a new trial; one of the grounds being that the verdict was contrary to the evidence. The motion was overruled, and Blank was sentenced by the court to serve a term of eighteen months in the state prison. To reverse the judgment he has brought the case to this court on appeal.

Appellant has assigned numerous errors but has confined his discussion to the one assignment of whether the court erred in overruling his motion for a new trial. The assignments of error not discussed are deemed waived, and we shall not consider them.

The facts of the case are about as follows: Richards, the alleged owner of the eighteen head of sheep mentioned in the information, is, and for six years immediately preceding the trial of this cause had been, engaged in the sheep industry. He grazed his sheep upon the public domain in the Counties of Emery and Carbon, this state. In April, 1911, he branded his sheep, about 2300 head, with what is known as a "wool" brand. The brand consisted of a cross made with black paint and placed on the back and side of the sheep where it could be readily seen. In October 1911, Richards sold to appellant and one Emile Ceas, 1010 head of sheep. The sheep, when delivered, were all marked with Richard's earmark and with his wool brand, the cross. These sheep, immediately after they were delivered, were corralled and branded with a wool brand consisting of a figure eight made with red paint. The earmarks were not changed. The figure 8 was, at the request or suggestion of Richards, placed over (on top of) his own brand, the cross. That is, the black cross brand was not removed and the figure eight was placed over the cross, thereby partially, and, in some instances, completely obliterating (covering up) the cross. Richards, at the same time and place, rebranded the remainder of his herd with the black cross wool brand. After the sale and delivery

of the 1010 sheep to appellant and Ceas, the two herds were kept apart and herded separately until November, 1911. Calvert had been working for Richards for some months prior to the sale and continued to work for him for several weeks thereafter. Richards' sheep were kept and herded by themselves and were in charge of Calvert and a herder by the name of Anderson. About November the two herds as they were being driven off the mountain onto the winter range, got mixed. It was then agreed between Richards, appellant, and Ceas that the two herds should be run and grazed as one herd; that Richards should furnish a camp mover; and that appellant and Ceas should give special attention to the herding of the sheep. Richards had Anderson, who was in his employ, move camp when necessary and assist generally in looking after the sheep. Anderson made his headquarters at Huntington, Emery County, and, at frequent intervals visited the camp and observed the sheep. Calvert, who was in the employ of Richards, was with the sheep for a short time after the herds were mixed. On or about the 19th of November, he, in company with Anderson, went to Huntington, where he remained a few days. While in Huntington, Calvert went to one of the stores there and purchased a pound of red paint for appellant. On November 23d he accompanied Anderson back to the sheep camp, taking with him the pound of red paint, which he delivered to appellant. As they were going from Huntington to the camp Anderson observed the red paint in Calvert's pocket. He also saw it in appellant's coat pocket after they arrived at the camp. On November 28th Anderson returned to Huntington, leaving Calvert and appellant with the herd. On December 1st Anderson again visited the camp and observed that about 18 head of the sheep had been recently branded with a figure eight made of red paint. He, in company with Calvert, returned to Huntington. Calvert quit the employ of Richards, went to Price, Utah, and did not again visit the sheep camp. Anderson reported to Richards the circumstance of the recent branding of the eighteen sheep with the figure eight. On December 2d

Richards, in Company with Anderson and one Drew, a brother-in-law of Richards, went to the sheep camp to investigate the recent branding of the 18 sheep mentioned. On arriving at the herd Richards had the sheep "bunched," herded closely together, and the eighteen sheep that had the appearance of having been recently branded caught and examined in the presence of appellant.

It is contended on behalf of the state that on this occasion appellant was questioned by Richards and Anderson regarding the branding of the sheep and the circumstances under which it was done, and that appellant made certain incriminating statements which tended to show that he committed the crime of which he stands convicted. Anderson was called as a witness by the state and testified in part on this point as follows: "Richards looked at them (the sheep recently branded) . . . and asked Martin Blank (appellant) what this meant, and Blank replied, 'Why, they are my sheep. What's the matter?' Richards said, 'It looks like your sheep, doesn't it, the way you have cut my wool brand and put your brand on,' . . . Blank said, 'That sheep is my sheep; has got my brand on. . . . ' Richards asked him what he was going to do. Blank told him he wasn't going to do anything; they were his sheep; that he had branded them over. Q. I will ask you if this black cross which you saw under the figure eight was in the same condition as when you saw it prior to this time? A. Well, the figure eight, where it was put on, it was put on over this black cross and you could see where the black cross had been cut." On cross-examination he testified in part as follows: "Q. When you first spoke to him he said that he had rebranded some of his own sheep, didn't he? A. Yes, sir. . . . Q. He told you that Calvert didn't have anything to do with it; that he branded them himself? A. Yes, sir. Q. And that he did it because the sheep belonged to him and his partner? A. Yes, sir; that is right." The witness also testified that later on he had a conversation with appellant in which appellant said that "he had just branded

his own sheep and that he said that if I had been in camp it would have been all right."

George A. Drew, another witness for the state, testified that he was present on that occasion and examined the sheep, and that "the brand, as I remember, on the sheep was generally on the back, and it was over the black cross that the fresh brand invariably appeared: . . . The black cross, in some cases where the fresh brands were over this cross, looked as if it had been clipped off in other cases looked as if they had been picked off." The witness further testified that, when Richards questioned appellant in regard to the matter, appellant stated that "he had a right to brand his own sheep."

Richards testified that his brand, the black cross, was nearly cut off of the eighteen sheep before the fresh figure eight brand was put on; that there were remnants of the black cross brand on the sheep under the figure eight; that when he first invited appellant's attention to the fresh red paint brand and asked him who had been branding the sheep appellant answered, "Don't know," and that appellant "finally ended up by saying . . . the brands were wearing off and he had rebranded some." On cross-examination he was asked the following question, "You, . . . as a matter of protection to yourself, have had oftentimes to rebrand some of your sheep;" and he answered: "I brand twice a year. . . . Q. And it frequently happens that in grazing on the oak brush or brush in that neighborhood, sometimes a portion of your brand is torn away, the wool pulled out? A. Oh, yes."

After the parties mentioned had examined the sheep on the occasion referred to, Richards and Drew returned to Huntington, and Anderson remained at the herd grounds with appellant and his partner Ceas. On December 4th Richards, in company with Samuel Bunnell, a deputy sheriff, and one Ed. Gordon again visited the sheep camp. When they arrived there the deputy sheriff placed appellant under arrest. The sheep were again caught and were ex-

.amined by the deputy sheriff. The deputy sheriff was a witness for the state and testified:

"I found there some evidence of an old brand, kind of a cross made with black paint. There was some of the old brand on that still showed through the red paint. This light red paint had been put right on top of the black paint, apparently covering (it) up. . . . It looked like a crevice had been cut along the sheep's back and across the top of the back like the black cross had been cut out entirely, but there was a little evidence of the black paint. I pulled some of it off. . . . I asked him after I had placed him under arrest if he branded those sheep. He told me that he didn't. I asked him who did. He said he didn't know. . . . I asked him if he was willing to give up the sheep. He said he was willing to give them up."

The foregoing is, in substance, the evidence introduced by the state.

When the state rested, counsel for Calvert, who was also counsel for appellant, moved the court to dismiss the action as against Calvert on the ground that the evidence was insufficient to warrant the court in submitting the case to the jury as to him. The motion was overruled. There was absolutely no evidence upon which to base a well-founded suspicion that Calvert had anything whatever to do with the branding of the sheep. In fact, the evidence affirmatively shows that he took no part whatever in the branding. True he, at the request of appellant, purchased the paint and delivered it to appellant at the sheep camp. Assuming, for the sake of argument, that appellant, in branding the eighteen sheep committed a crime, the purchase of the paint by Calvert was not, under the circumstances, sufficient to justify a vague suspicion that he knew or even believed that appellant intended to make an unlawful use of the paint. We shall again refer to this feature of the case later on.

Emile Ceas testified that he was present at the sheep camp when Richards spoke to appellant about the branding of the sheep, and that appellant answered Richards by saying

that the sheep he branded were his (appellant's) sheep. Appellant testified, and his testimony is not disputed, that after he and his partner (Ceas) and Richards mingled their sheep and made one herd of them the sheep while grazing frequently came in contact with brush and also with wire fences, and occassionally some of the sheep would pass under or through the fences and in doing so would come in contact with the wire, which in some instances tore off and almost obliterated the brands, the black cross as well as the figure eight red paint brand. He also testified that the eighteen sheep he branded were his and his partner's sheep on which the figure eight had become dim and in some cases nearly obliterated; that he did not brand any of Richards' sheep.

The record shows that appellant, his partner Ceas, and Calvert are Frenchmen and are unable to read or write the English language. Calvert was unable to speak the English language at all, and it was difficult for a party speaking with him in English to make him understand the subject-matter of the conversation sought to be carried on. Appellant spoke English very imperfectly. These parties testified through an interpreter, and the record shows that while they were being examined, questioned by appellant's counsel, they had much difficulty in making themselves understood.

We are clearly of the opinion that the evidence is insufficient to sustain the verdict. It was not shown that Richards did not have, after the branding of the eighteen sheep in question by appellant, the number of sheep branded with his brand to which he was entitled. Nor was it shown that there were more than 1010 head (the number of sheep purchased by appellant and Ceas from Richards) in the herd branded with the red paint figure eight brand. It would have been an easy matter for the state to have determined whether the appellant and Ceas had more sheep than the 1010 (the number to which they were entitled) branded with their brand by merely counting the sheep branded with the figure eight brand. A count of the sheep branded with the black cross brand would also have shown whether

Richards had the number branded with that brand to which he was entitled. This would have determined the controversy as to the ownership of the eighteen sheep, provided, of course, no sheep had strayed away from the herd or had otherwise been lost. The evidence, however, what there is on this point, tends to show that there were no losses, and that the sheep were all accounted for.

It is conceded that at the time appellant and his partner purchased their sheep (1010) from Richards they, at Richards' request or suggestion, placed their brand over the black cross brand; hence the finding of remnants of the black cross brand under the figure eight brand on the eighteen sheep examined by Richards, Anderson, and the other men referred to was not, in and of itself, an incriminating circumstance, because the undisputed evidence shows (in fact it is conceded) that practically all of appellant's sheep were branded by placing the figure eight brand over the black cross brand. The evidence without conflict shows that sheep grazing upon the public domain in the vicinity of wire fences and where there is more or less brush frequently come in contact with the brush and occasionally with the wire fences, and the wool brands on the sheep are occasionally torn off and obliterated.

The court having overruled the motion to dismiss the case as to Calvert, against whom there was no incriminating evidence whatever, the jury might well have concluded that, if in the opinion of the court the evidence was sufficiently strong against Calvert to warrant a submission of the case as to him, it must necessarily, in view of the fact that appellant admitted branding the sheep, establish his guilt beyond a reasonable doubt. Upon no other theory can we account for the verdict rendered against appellant.

The judgment is reversed, with directions to the lower court to grant a new trial.

STRAUP and FRICK, JJ., concur.